USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: <u>April 30, 2010</u>

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
                                                :

UNITED STATES OF AMERICA              :
                                                :
                                              :     09 Cr. 662 (PAC)
                                              :
         - against -           :     <u>MEMORANDUM</u>
                                              :     <u>OPINION & ORDER</u>
ROSS MANDELL, STEPHEN SHEA,     :
ADAM HARRINGTON a/ka/ "Adam Rukdeschel," :
ARN WILSON, ROBERT GRABOWSKI and   :
MICHAEL PASSARO              :
                                              :
                       Defendants.      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

       Defendants Ross Mandell ("Mandell"), Stephen Shea, Adam Harrington, Arn Wilson, Robert Grabowski and Michael Passaro are charged with one count of conspiracy to commit securities fraud, mail fraud and wire fraud and one substantive count of securities fraud. The Indictment alleges that, from 1998 through 2006, Mandell and his co-defendants participated in a scheme to defraud investors by soliciting funds under false pretenses, manipulating the market for certain securities, and by misappropriating and failing to use investors' funds as promised. The Defendants, along with others under their control, allegedly used "boiler room" sales tactics to bilk investors out of millions of dollars.

       Mandell moves to suppress all evidence seized pursuant to two search warrants executed in November, 2006, at the offices of Sky Capital Holdings Ltd. ("SKH"), Sky Capital LLC ("Sky LLC") and Sky Capital Enterprises ("SKE") (collectively, "Sky Capital"). The first warrant, which was executed on or about November 6, 2006, authorized the search of Sky Capital's offices at 110 Wall Street in New York, New York

(the "Sky Offices").  The second warrant, which was executed on or about November 9, 2006, authorized the search of a basement storage area at 110 Wall Street.  The search warrants were issued based on an affidavit (the "Affidavit") submitted on November 2, 2006 by Special Agent Kurt Dengler ("Dengler") of the Federal Bureau of Investigations ("FBI").  Mandell contends Dengler omitted material information from his Affidavit in reckless disregard for the truth and seeks suppression of the two searches under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).  In the alternative, Mandell asks the Court to hold a <u>Franks</u> hearing to determine whether suppression is required.

A <u>Franks</u> hearing is required when the defendant makes a "substantial preliminary showing" that a false statement was made in the search warrant affidavit either "knowingly and intentionally" or with "reckless disregard for the truth," and that "the allegedly false statement is necessary to the finding of probable cause."  <u>Franks</u>, 438 U.S. at 155-56.  Upon review of Mandell's motion papers and memoranda of law, and after oral argument, the Court finds that Mandell has failed to make such a "substantial preliminary showing" and the motion to suppress and for a <u>Franks</u> hearing is DENIED.

Mandell also moves for a bill of particulars under Rule 7(f) of the Federal Rules of Criminal Procedure.  Among other things, he seeks to compel the Government to particularize the allegations in the Indictment regarding misrepresentations allegedly made to investors and to identify the allegedly defrauded investors.  The level of detail sought demonstrates that the request is nothing more than an "ill-disguised attempt[] at general pretrial discovery."  <u>United States v. Torres</u>, 901 F.2d 205, 234 (2d Cir. 1990).

The indictment adequately apprises Mandell of the charges against him and his motion for a bill of particulars is DENIED.[1]

## I. Validity of the Warrants

There is a "presumption of validity with respect to the affidavit supporting a search warrant." Franks, 438 U.S. at 171; see also United States v. Awadallah, 349 F.3d 42, 66 (2d Cir. 2003).  In certain limited circumstances, however, "a defendant may challenge the truthfulness of factual statements made in the affidavit, and thereby undermine the validity of the resulting search or seizure." United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (quoting Awadallah, 349 F.3d at 64.)  "One such circumstance is where the affidavit in support of the search warrant is alleged to contain deliberately or recklessly false or misleading information." United States v. Canfield, 212 F3d 713, 717 (2d Cir. 2000).

Hearings under Franks are not freely granted.  The defendant "must make a 'substantial preliminary showing' that: (1) the claimed inaccuracies or omissions [in the affidavit] are the result of the affiant's deliberate falsehood or reckless disregard for the truth; and (2) the alleged falsehoods or omissions were necessary to the judge's probable cause finding." United States v. Salameh, 152 F.3d 88, 113 (2d Cir. 1998) (citing United States v. Levasseur, 816 F.2d 37, 43 (2d Cir. 1987)).  In Franks the Court explained that,

> [t]o mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine.  There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must accompanied by an offer of proof.  They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be

---

[1] Mandell also moves for leave to supplement his motions and to file additional motions based on his receipt of additional discovery materials and his "further review of the voluminous materials already provided." (Notice of Motion ¶ C.)  Mandell further requests leave to join any motions made by his co-defendants. (Id.)  These requests are premature and they are DENIED.

> accompanied by a statement of supporting reasons.  Affidavits or sworn or
> otherwise reliable statements should be furnished, or their absence
> satisfactorily explained.

Franks, 348 U.S. at 171; see also United States v. Falso, 544 F.3d 110, 125-26 (2d Cir.

2008).  If the requisite "substantial preliminary showing" is made, and a hearing is held,

the defendant must establish that there were intentional or reckless material

misstatements or omissions in the search warrant affidavit by a preponderance of the

evidence.  See Franks, 348 U.S. at 156; United States v. Klump, 536 F.3d 113, 119 (2d

Cir. 2008); United States v. Ferguson, 758 F.2d 843, 848 (2d Cir. 1985).

   "[E]very statement in a warrant affidavit does not have to be true," United States

v. Martin, 426 F.3d 68, 73 (2d Cir. 2005), and "[a]llegations of negligence or innocent

mistake are insufficient."  Franks, 438 U.S. at 171; see also United States v. Tranquillo,

606 F. Supp. 2d 370, 379 (S.D.N.Y. 2009).  Further, "the mere intent to exclude

information is [likewise] insufficient . . . [since] every decision not to include certain

information in the affidavit is 'intentional' insofar as it is made knowingly."  Awadallah,

349 F.3d at 67-68 (quoting United States v. Colkley, 899 F.2d 297, 300-01 (4th Cir.

1990)).  "[A]n affiant cannot be expected to include in an affidavit every piece of

information gathered in the course of an investigation."  Id. (quoting Colkley, 899 F.2d at

300-01).

   While the meaning of "an intentional falsehood is self-evident," United States v.

Kunen, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004), the same cannot be said for the term

"reckless disregard for the truth."  Franks does not explain the term "beyond indicating

that it is something more than mere negligence on the part of the affiant."  Kunen, 323 F.

Supp. 2d at 395 (citing Franks, 438 U.S. at 171).  The Second Circuit has held that

"recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality of the search." United States v. Riley, 76 F.3d 1271, 1280 (2d Cir. 1996). "[M]ost circuits that have considered the question have embraced a subjective test for recklessness similar to that used in First Amendment libel cases . . . ." United States v. Vilar, No. S305CR621KMK, 2007 WL 1075041, at *26 (S.D.N.Y. Apr. 4, 2007) (collecting cases). Under the prevailing standard, "the question is not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether the defendant in fact entertained serious doubts as to the truth of the subject statements." Kunen, 323 F. Supp. 2d at 395 (quotation marks omitted) (collecting cases); see Vilar, 2007 WL 1075041, at * 26 ("one 'recklessly disregards' the truth when one makes allegations while entertaining serious doubts about the accuracy of those allegations."). In considering Franks challenges, lower courts in this Circuit have applied this "serious doubt" standard. See United States v. Goldenberg, No. 05 CR. 1034(DC), 2006 WL 266564, at *4 (S.D.N.Y. Feb. 3, 2006); United States v. Harper, No. 05-CR-6068L, 2006 WL 2873662, at *8 (W.D.N.Y. Oct. 6, 2006); Vilar, 2007 WL 1075041, at *27; Kunen, 323 F. Supp. 2d at 395; United States v. Markey, 131 F. Supp. 2d 316, 324 (D. Conn. 2001).

There is some authority for applying a different "reasonable person" test to omissions as opposed to false assertions. See, e.g., Wilson v. Ruso, 212 F.3d 781, 788 (3d Cir. 2000); United States v. Harding, 273 F. Supp. 2d 411, 426 (S.D.N.Y. 2003); United States v. Perez, 247 F. Supp. 2d 459, 474 (S.D.N.Y. 2003).[2] In Vilar, however, Judge Karas declined to apply the "reasonable person" test to omissions, explaining that

---

[2] In Wilson the Third Circuit held that "omissions are made with reckless disregard if an officer withholds facts in his ken that '[a]ny reasonable person would know was the kind of thing the judge would wish to know.'" Wilson, 212, F.2d at 783 (quoting United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993)).

"a test that invokes the mythical 'reasonable person' speaks the language of negligence. Yet, as noted, 'allegations that amount to negligence or innocent mistake do not constitute the required [Franks] showing.'"  Vilar, 2007 WL 1075041, at *27 (quoting Kunen, 323 F. Supp. 2d at 395).  Judge Karas' reasoning finds support in the Second Circuit's holding that "recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality of the search."  Riley, 76 F.3d at 1280 (2d Cir. 1996) (citing Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991)).  The Court joins Judge Karas in holding that, regardless of whether the defendant complains of false assertions or omissions, "'the question is not what a reasonably prudent person would have appreciated given the attendant circumstances but rather whether' the affiant at least had reason to seriously doubt the truth of the allegations."  Vilar, 2007 WL 1075041, at *27 (quoting Kunen, 323 F. Supp. 2d at 395).

While under Franks, false assertions and omissions are governed by the same "serious doubt" standard, as a practical matter "the affirmative inclusion of false information in an affidavit is more likely to present a question of impermissible official conduct than a failure to include a matter that might be construed as exculpatory."  Colkley, 899 F.2d at 301; see also United States v. Atkin, 107 F.3d 1213, 1217 (6th Cir. 1997).  This is because allegations of omission "potentially open[] officers to endless conjecture about investigative leads, fragments of information, or other matter that might, if included, have redounded to defendant's benefit."  Colkley, 899 F.2d at 301; see also Atkin, 107 F.3d at 1217.  "'All storytelling involves an element of selectivity,' so it is not shocking that '[e]very affidavit will omit facts which, in retrospect, seem significant.'"  Vilar, 2007 WL 1075041, at *27 (citations omitted).

"To determine if the false information was necessary to the issuing judge's probable cause determination, <u>i.e.</u>, material, 'a court should disregard the allegedly false statements and determine whether the remaining portions of the affidavit would support probable cause to issue the warrant.'"  <u>Awadallah</u>, 349 F.3d at 65 (quoting <u>Canflied</u>, 212 F.3d at 718).  Omissions from a warrant affidavit "are not material unless they cast doubt on probable cause.  The omitted information and the information in the affidavit must be considered as a whole in determining if probable cause continues to exist."  <u>United States v. Marin-Buitrago</u>, 734 F.2d 889, 895 (2d Cir. 1984).  As explained by the Fourth Circuit in <u>Colkley</u>, "[f]or an omission to serve as the basis for a hearing under <u>Franks</u>, it must be such that its inclusion in the affidavit would defeat probable cause . . . .  Omitted information that is potentially relevant but not dispositive is not enough to warrant a <u>Franks</u> hearing."  <u>Colkley</u>, 889 F.2d at 301.  In the final analysis, "[i]f the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate."  <u>Canfield</u>, 212 F.3d at 718.

In <u>Illinois v. Gates</u>, the Supreme Court explained that "probable cause is a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  462 U.S. 213, 232 (1983).  "The task of the issuing magistrate [or judge] is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place."  <u>Falso</u>, 544 F.3d at 117 (quoting <u>Gates</u>, 426 U.S. at 238).  In assessing probable cause, courts consider the "totality of the circumstances," <u>Gates</u>, 462 U.S. at 230-31, and the evidence "must be seen and weighed not in terms of library analysis by

scholars, but as understood by those versed in the field of law enforcement." Gates, 462 U.S. at 232.

SKH and SKE were both Delaware corporations whose stock was publicly traded on the Alternative Investment Market ("AIM") of the London Stock Exchange. (Affidavit ¶¶ 7, 4, Affirmation of Susan Wolfe ("Wolfe Aff."), Ex. A.)  Sky LLC was a brokerage firm based in New York City.  (Id. ¶ 7.)  Prior to founding Sky Capital, Mandell worked at, and allegedly controlled, The Thornwater Company, L.P. ("Thornwater"), a venture capital firm and broker-dealer.  (Id. ¶ 8.)  In late August, 2006, Dengler submitted an affidavit in support of a warrant to search the Sky Offices.  The affidavit was based primarily on recorded conversations between a cooperating witness who had worked with Mandell at Thornwater named Mario Figueroa ("Figueroa") and a Sky Capital broker named Philip Akel ("Akel").  (Defendant's Memorandum in Support ("Defendant's Mem. at 2, 4.)  Figueroa had been convicted of securities fraud in an unrelated case and hoped to receive a more lenient sentence by cooperating with the Government.  (Affidavit ¶ 9.)  Based on Dengler's affidavit, Magistrate Judge Gabriel Gorenstein issued a search warrant for the Sky Offices on August 24, 2006.  (Id. ¶ 4.) After the warrant issued, however, Akel agreed to cooperate with the Government upon being told he was under investigation.  (Id.)  In light of this, the Government decided not to execute the search warrant in order afford the FBI more time to gather information. (Id.)

On November 2, 2006, Dengler submitted the affidavit in question to Magistrate Judge Douglas Eaton.  (Government's Memorandum in Opposition ("Government's Mem.") at 2; Defendants Mem. at 2; Affidavit at 38.)  In the Affidavit, Dengler

described, among other things, information conveyed by Figueroa (including information about three investors who dealt with Mandell and Sky Capital), Akel and an investor who claims he was defrauded by Mandell named Christopher Tappin ("Tappin").  Dengler also described a number of consensually recorded conversations, as well as information obtained by two undercover FBI agents.  Based on this and other information, the Affidavit states that there is probable cause to believe that Mandell and others at Sky Capital are, and have been: disseminating materially false and misleading statements in order to induce investors to purchase securities; running a "ponzi" scheme; and manipulating the market for securities issued by SKH and SKE.  (Affidavit ¶ 6.)

The Affidavit read by itself is more than sufficient to establish probable cause.  At oral argument Mandell suggested that there was only one false statement – that the level of commission paid on sales of SKE stock was 50%.  See infra pp. 17-18; (Affidavit ¶ 18.)  But even if that statement is incorrect, it is well short of a false statement knowingly and intentionally made.  The Affidavit makes numerous references to a 10% commission; but if Dengler intended to deceive, he would not have referred to the 10% commission and he certainly would not have referred to the 10% commission on numerous occasions.

The primary basis for Mandell's attack on the Affidavit's sufficiency is not that it was deliberately false and misleading, but rather that Dengler omitted a vast array of information.  According to Mandell, the omissions were of a magnitude and nature that made the Affidavit false.  He argues that that the Dengler's sources of information were "fundamentally flawed."  (Defendant's Mem. at 23.)  According to Mandell, Figueroa's allegations "were not corroborated," and since he was cooperating with the Government in the hopes of leniency, his credibility "was necessarily suspect."  (Id.)  Further, Tappin

was the only allegedly defrauded investor identified by Dengler, and that Tappin's story was suspect.  (Id.)  The recorded conversation involving Figueroa and Akel were not fairly represented; indeed, the recordings only implicate Figueroa and Akel in criminal behavior.  (Id.)  Finally, Akel's allegations were contradicted by tape recordings he helped to obtain after he agreed to cooperate.  (Id.)

These omissions, Mandel claims, were critical to the finding of probable cause and were made with reckless disregard for the truth.  As he sees it, if the omitted information is included in the Affidavit, probable cause for the search warrants vanishes, and so, the fruits of the FBI search of the Sky Offices and the basement storage area must be suppressed.  (Id. at 29.)

Mandell's attack on the Affidavit is at best a glancing blow.  His argument is largely based on snippets of recorded conversations that fail to undermine the factual allegations in the Affidavit.  With the benefit of hindsight, Mandell picks and chooses from the mass of information obtained by the FBI before it sought a warrant.  He points to conversations where he and others appear to be engaged in lawful activity.  Those engaged in criminal activity do not, however, typically advertise their illegal conduct – instead, they attempt to disguise it.  Moreover, since the omissions are, to a great extent, only of tangential import, their inclusion in the Affidavit would not defeat probable cause.

At oral argument, Mandell argued that the Magistrate Judge may have been unaware that Sky Capital stock was traded on the London Stock Exchange's AIM.  If granted a Franks hearing, he promises to bring experts on how the London market operates.  Dengler did not, however, have to provide the Magistrate Judge a thesis on, or

explanation of, the differences (if any) between London markets and U.S. markets. Dengler disclosed that Sky Capital Holdings, Ltd. and Sky Capital Enterprises were traded on the London Stock Exchange.   (Affidavit ¶ 7.)  Dengler also disclosed how an investor from the United Kingdom had been defrauded; how commissions for Sky Capital stock were calculated and surreptitiously paid; how a "big whale" of an investor might be induced to invest in Sky Capital stock; as well as how the Sky Capital and its brokers made misrepresentations about companies ("Global Secure" and "Advanced Spinal") whose stock Sky Capital was peddling.  An explanation of the how the London Stock Exchange operates is not required in order to understand these activities, each of which fully supports a finding of probable cause to issue a search warrant.

Mandell has failed to make a "substantial preliminary showing" that Dengler omitted material facts from the Affidavit with reckless disregard for the truth and therefore his motion for a Franks hearing and to suppress is denied.

**A. Reckless Disregard for the Truth**

**i. Misleading Statements to Investors**

Mandell contends that Dengler only identified one defrauded investor, Tappin, in support of his "allegations of a massive fraud."  (Defendant's Mem. at 24.)  Further, according to Mandell, Dengler recklessly failed to disclose an opinion by Judge Ronald Zweibel of the Supreme Court of New York County which he contends expressed "doubt about the validity of Tappin's claims and his credibility."  (Id.)

Tappin is not the only investor identified in the Affidavit; Figueroa told Dengler that three of his former clients said that when Thornwater private placements failed, Mandell promised them shares in Sky Capital private placements in return for "not

complaining about the Thornwater private placements." (Affidavit ¶ 12.) Mandell points out that the information Figueroa provided about the three investors is hearsay, but "[a] finding of probable cause may be based in whole or in part, on hearsay from a reliable informant." United States v. Laufer, 245 F. Supp. 2d 503, 507 (W.D.N.Y. 2003) (citing Gates, 462 U.S. at 243-46). Mandell stresses that Figueroa is himself a criminal, who agreed to cooperate with the Government in the hopes of leniency. Like the hearsay argument, this is largely irrelevant. "The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant." Franks, 438 U.S. at 171. The inquiry is not whether Figueroa (and once he agreed to cooperate, Akel) was lying, instead it is whether Dengler omitted information from the Affidavit with reckless disregard for the truth: "attack[s] upon the statements of . . . informant[s] . . . are permitted only for the purpose of demonstrating the misstatements of *governmental* actors." United States v. Walker, 922 F. Supp. 732, 752 (N.D.N.Y. 1996).

Dengler did not have to disclose Judge Zweibel's opinion. The learned judge's statement concerning the oral contract between Tappin and Mandell is pure dicta. Judge Zweibel explained that his doubt was "based on the evidence before this Court," and that he did not need to decide the issue of whether there was an enforceable oral contract "because the court finds that there was no agreement to arbitrate in this case in any event." (Supreme Court Opinion at 5, Wolfe Aff., Ex. F.) As with so many of omissions relied upon by Mandell, if Judge Zweibel's opinion were added to the Affidavit probable cause would still exist. Judge Zweibel's opinion confirms what Tappin told Dengler: Mandell traveled to London and promised Tappin 150,000 shares of Chipcards and

150,000 shares of SKH in exchange for an earlier investment made by Tappin through Thornwater.  (Id. at 3.)  Shortly thereafter, Tappin and Robert Grabowski entered into a written agreement confirming this understanding.  (Id. at 2.)  Whether or not this constitutes an enforceable contract, it certainly lends credence to Tappin's story and in turn supports probable cause for the warrant.  Finally, assuming Dengler knew of Judge Zwiebel's opinion on November 2, 2006 when he submitted the Affidavit, he was not required to include "every piece of information gathered in the course of . . . [the] investigation."  Awadallah, 349 F.3d at 67-68.

Figueroa told Dengler that when he worked at Thornwater, he participated in at least five private placements where Mandell instructed brokers to represent to investors that their funds would be used for initial public offerings ("IPOs").  (Affidavit ¶ 10.)  According to Figueroa, no effort was made to bring the companies public and investors' funds were used to pay excessive undisclosed commissions and for the benefit of, among others, Mandell.  (Id.)  Mandell faults Dengler for not disclosing that three of the four private offering memorandums ("POMs") for the private placements Figueroa said were fraudulent contain "no mention of an initial public offering."[3]

The three POMs consist largely of mind-numbing boilerplate.  Franks teaches that not every fact in a warrant affidavit needs to be correct, "for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes has to be garnered hastily."  Franks. 438 U.S. at 164.  Failure to notice that the three POMs do not reference

---

[3] Mandell also argues that one of the five companies "never did a private placement."  (Defendant's Mem. at 25.)  The argument is based on Mandell's assertion that "[a]vailable records show no private placement in . . . [the company's] stock," (id. at 4 n.3.); in other words, the argument is based on rank speculation.

an IPO might be negligent, but does not indicate that Dengler entertained "serious doubts" about the truthfulness of his allegations.  Kunen 323 F. Supp. 2d at 395.

In any event, that the three POMs do not reference IPOs is not of any significance.  The Affidavit states that Mandell instructed brokers "that they were to represent to prospective private placement investors that the invested funds were to be used to make initial public offerings in the companies' stock – representations that the brokers, including CW-1 [Figueroa], conveyed to investors . . . ."  (Affidavit ¶ 10.)  The lists of intended uses of investors' funds in the "Use of Proceeds" sections of the three POMs do not purport to be exclusive; they appear to be illustrative.  More importantly, the absence of reference to IPOs in the three POMs does not undermine Dengler's allegation that Mandell told brokers to "represent" that the companies were going public and that the brokers made such representations.  Surely brokers could have made oral representations to investors that their investments would be used for public offerings.[4]

Mandell contends that Dengler omitted recordings where he told brokers at Sky Capital not to make misrepresentations and where he told Akel to "be brutally honest with potential investors."  (Defendant's Mem. at 25.)  He argues that these recordings contradict Akel's allegation that Sky Capital brokers were instructed to make misrepresentations to investors.  (Affidavit ¶¶ 39-46.)  The recordings relied upon by Mandell are all from August and September of 2006.  (Id.)  As the Government points out, during this time Mandell apparently became suspicious that he was being recorded, stating during one meeting "[n]o one is taping me, are they, no tape recorders?"

---

[4] Mandell cites to a conversation recorded by Akel on November 13, 2006, where a Sky Capital employee said that the allegation Mandell never intended to bring certain companies public was "ridiculous." (Defendant's Mem. at 5.)  Since the conversation was recorded 11 days after Dengler submitted the Affidavit, the employee's statement is irrelevant.

(9/11/2006 Transcript at 1, Wolfe Aff., Ex. K-9; see also 9/14/2006 Transcript at 5, Governments Mem., Ex. A.)  There was also a movement afoot at Sky Capital to wrest control over the company from Mandell.  (9/12/2006 Transcript at 1-2, Wolfe Aff., Ex. K-3.)  Regardless, simply because Mandell – on a limited number of occasions – directed brokers to tell investors the truth, does not mean that on other occasions he did not tell brokers to lie.  Likewise, that Mandell directed Akel to tell investors that "the company needs funding," (9/28/2006 Transcript at 4, Wolfe Aff., Ex. K-23), and claimed to have told some investors that "there is financial difficulty right now," (Id. at 11), does not mean that Mandell was always honest with investors.  Indeed, a successful fraud often involves telling sufficient truth so that the half-truth and the non-truth can be fully effective.  Dengler did not act with "reckless disregard for the truth" by accepting Akel's allegations of fraud at Sky Capital simply because Mandell – on a limited number of occasions – claims he told the truth and directed others to do the same.

Mandell also takes issue with Dengler's allegation that Mandell promised brokers a 10% commission on the "Current Raise" and that the commission would not be disclosed to investors.  (Defendant's Mem. at 25-26.)  He argues that Dengler omitted "that the amount of the commission and the disclosure requirement were the subject of ongoing dispute and debate."  (Id.)  Mandell relies primarily on a September 12, 2006 recorded conversation where he told Akel he was "trying" to pay and "working on ten percent."  (9/22/2006 Transcript at 3, 14, Wolfe Aff., Ex. K-6.)  He also notes that that Akel had a number of conversations with Sky LLC's and SKH's president, Michael Recca ("Recca"), who initially disagreed with the 10% commission, and said the commission would be 3%.  (Defendant's Mem. at 26.)

It does not follow that because Mandell told Akel he was "working" on a 10%
commission, he did not promise brokers they would make a 10% commission on the
Current Raise.  In a September 11, 2006 recorded conversation referenced in the
Affidavit, Mandell said "they will make 10% on this," and "you guys will make ten
percent on this deal."  (9/11/2006 Transcript at 3, Wolfe Aff., Ex. K-9; Affidavit ¶ 53.)
And the recorded conversations make clear that in "working" on a 10% commission,
Mandell and others were attempting to find a creative way to defraud investors.  Indeed,
as pointed out by the Government, Recca's initial reaction was that a 10% commission
would be illegal.  (9/12/2006 Transcript at 1, Wolfe Aff., Ex. K-3.)  Nor was the 10%
commission on the Current Raise the only allegation in the Affidavit regarding excessive,
undisclosed commissions.  (Affidavit ¶ 42.)   There was also other evidence of Sky
Capital brokers being paid improper commissions that was not expressly referenced in
the Affidavit.  For instance, a Sky Capital broker told Recca that he had been paid a 10%
commission "under the table" for selling SKH stock in the United Kingdom.  (9/12/2006
Transcript at 1, Wolfe Aff., Ex. K-3.)

Finally, in his reply, Mandell argues that while the Affidavit states that probable
cause exists to believe that "individuals associated with Sky Capital . . . have been and
are continuing to disseminate and cause to be disseminated materially false and
misleading statements about securities traded though Sky Capital," (Affidavit ¶ 6.),
Dengler did not obtain information from any Sky Capital investors.  (Defendant's Reply
at 3.)  Mandell also points out that Figueroa was a Thornwater, not a Sky Capital,
employee.  (Id.)  The Affidavit, however, discusses three former Thornwater investors
who Mandell told – after he formed Sky Capital – that they would receive SKH shares

and shares in "other private placements being sold through Sky Capital Holdings." (Affidavit ¶ 12.)  Furthermore, while Figueroa never worked for Sky Capital, Akel did. (Id. ¶ 16.)  And Akel provided a wealth of information regarding misrepresentations and false statements made by Mandell and others at Sky Capital.  (Id. ¶¶ 38-57.)

**ii. Ponzi Scheme**

Mandell makes two arguments in attempt to show that Dengler omitted information with reckless disregard for the truth pertaining to his allegation that Mandell and others were running a ponzi scheme at Sky Capital.  First, Mandell points to two recorded conversations which he contends show that his personal expenses were carefully monitored by Sky Capital employees.  (Defendant's Mem. at 26.)  Second, he contends that Dengler misled the Magistrate Judge to believe that Mandell and others were using investor funds to pay brokers 50% commissions on investments, when the evidence shows that this was not the case.  (Id. at 27.)

The Affidavit states that, "[a]ccording to the Broker [Akel], Mandell has been receiving salaries from several of the Sky Companies and has given himself large bonuses and payments for personal expenses at a time when Sky Capital has been losing money."  (Affidavit ¶ 40.)  Mandell points out that during a September 12, 2006 conversation, Recca told Akel that Mandell "doesn't expense everything," and stated, "his American Express card, we monitor it very carefully."  (9/12/2006 Transcript at 3, Wolfe Aff., Ex. K-3.)  The transcript of an October 4, 2006 conversation between Akel and Fran Duffy reads "DUFFY talks about MANDELL taking expenses, how DUFFY accounts for it and how DUFFY takes money out knowing he takes expenses." (10/4/2006 Transcript at 4, Wolfe Aff., Ex. K-4.)  Mandell, however, fails to note that

during Akel's conversation with Recca, Recca conceded that Mandell's "boy Sal . . . is

being paid by Sky," and that Sky Capital paid Sal to fly to New York from Florida to

help Mandell move. (9/12/2006 Transcript at 3, Wolfe Aff., Ex. K-3).  Moreover, simply

because Recca monitored Mandell's American Express Card does not mean that Mandell

did not pay for his personal expenses though other improper means.  The reference to

Fran Duffy taking "money out knowing he takes expenses" is far too vague to impugn

Dengler's assertion that Mandell paid for personal expenses with Sky Capital funds.  And

personal expenses aside, the omitted conversations say nothing about Dengler's

allegations regarding the salary and bonuses Mandell paid himself.

          Prior to Akel's cooperation, the Government recorded a December 8, 2005

conversation he had with Figueroa.  Recounting the conversation, the Affidavit states:

> [T]he Broker [Akel] told CW-1 [Figueroa] that he wanted CW-1 to
> provide the Broker with his ten biggest former clients, so that the Broker
> could attempt to sell these individuals private placements in Sky Capital
> Enterprises, or Global Secure, a company the Broker stated was owned by
> Sky Capital Enterprises.  The Broker stated that the Sky Capital LLC
> brokers' commission on sales of Global Secure was 7%, and that the
> Brokers commission on any shares in Sky Capital Enterprises that he sold
> was 50%.  The Broker further stated that he would give CW-1 40% of the
> Broker's 50% commission for any investors in Sky Capital Enterprises
> stock provided by CW-1.

 (Affidavit ¶ 18.)

          Akel's exact words were that "it's either the private with seven percent there or its

Sky, only if I'm able to get somebody out at a price and debit at a higher price and make

the difference but that's, I'm on a fifty percent payout if that's the case."  (12/8/2005

Transcript at 19, Wolfe Aff., Ex. K-16.)  In other conversations, Akel told Figueroa that

private placement commissions were 7%, and claimed to never have said otherwise.

(1/6/2006 Transcript at 12, Wolfe Aff., Ex. K-2.)  Based on these omitted conversations,

Mandell argues that Dengler misled the Magistrate Judge into believing that he and others were paying brokers 50% commissions on sales of SKE stock.  (Defendant's Mem. at 27.)  He posits that "'[p]ayout' typically refers to a broker's share of the commission."  (Id. at 8.)  The Government contends that Mandell's argument assumes, without support, that Akel, Dengler and the Magistrate Judge understood the difference between a "commission" and "a payout."  (Governement's Mem. at 18.)

Akel's use of the term "payout" is rather vague.  During the passage relied upon by Mandell and referenced in the Affidavit, Akel seems to indicate that payout and commission mean the same thing.  But earlier in the conversation, Akel stated that "[i]f I do the stock and I'm able to buy at a buck forty, right and get it for a pound, if I'm able to do that, that'd be about sixty cents, the firm would take thirty cents, then that means I would get a thirty percent payout."  (1/6/2006 Transcript at 11, Wolfe Aff., Ex. K-2.)  Assuming Akel used payout to mean a broker's share of the commission, Dengler's misstatement in the Affidavit was negligent.  It is Mandell's burden to show that Dengler omitted information from the Affidavit with reckless disregard for the truth.  Given the lack of clarity regarding what Akel meant by "payout," in conjunction with the absence of any indication that Dengler was aware of what Akel in fact meant, mistaking "payout" for "commission" does not indicate that Dengler entertained "serious doubts" as to the truth of his statement that Akel would receive a "50% commission."

### iii. Stock Manipulation

Mandell assails Dengler's allegations regarding stock manipulation at Sky Capital from two angles.  First, he says that Dengler failed to disclose conversations where Akel was "neither prohibited nor even discouraged from putting in an order to sell a client's

shares." (Defendant's Mem. at 27.) Second, he argues that the evidence shows that the reason any sell orders were not executed was because the market for SKH and SKE stock was illiquid, not because brokers were attempting to cross the stock or follow the alleged "no net sales" policy. (Id.)[5] Mandell maintains that Dengler misrepresented how the AIM functions, which is unlike United States markets. (Defendant's Reply at 8-9.)

As for the conversations where Akel was not discouraged from selling his clients shares, Mandell's argument suffers from a now familiar infirmity. Simply because not all stock was crossed, and some sell orders were duly executed, does not mean that Sky Capital brokers did not cross stock or park it in the firms inventory account until it could be crossed. Just because Mandell, Sky Capital and the Sky Capital brokers complied with the law some of the time, does not mean that they did so all of the time. Akel told Dengler that brokers at Sky Capital crossed stock, that there was a "no net sales" policy, and that brokers were paid excessive undisclosed commissions when they engaged in such illegal behavior. (Affidavit ¶¶ 44.) Indeed, the Affidavit described conversations where Sky Capital employees discussed "cleaning up," which Akel informed Dengler is a euphemism for crossing stock. (Affidavit ¶¶ 49, 50, 52.) And as the Government points out, there were other conversations directly implicating Mandell and others in manipulating securities, although the conversations were not expressly referenced in the

---

[5] The Affidavit describes the illegal practice of crossing stock as follows: "a broker manipulates the market for a security by suppressing or discouraging sell order until they can be paired off with buy orders from other investors within the same firm. Typically, the customer buying the stock is not informed that the broker is soliciting the transaction not because it is beneficial for the buyer, but instead solely to offset sell order from another client." (Affidavit ¶ 35.)

    Akel told Dengler that Sky Capital had a "no net sales" policy, pursuant to which, if a broker could not talk a client out of selling his SKH or SKE shares, the broker had to find a Sky Capital client to purchase them. (Id. ¶ 44.) If the broker could not find a client willing to buy, Sky Capital would purchase the shares and hold them in inventory until they could be sold to a client. (Id.) The Affidavit states that brokers were given excessive commissions as rewards for "crossing" stock and effecting the "no net sales" policy, but the commissions were not disclosed to investors. (Id.) All of this was done in order to artificially inflate the price of SKH and SKE stock. (Id.)

Affidavit.  For instance, on October 4, 2006, Mandell discouraged Akel from placing a

market order for SKH shares:

> MANDELL – The market right now, the market is looking for any reason
> to right now to short, so if you put 10,000 on the market, there gonna turn
> that into 50,000, that's what's going on.
> AKEL – That's not me doing it, it's the customer telling me to sell, and I,
> you know.
> MANDELL – I'm not arguing, but I'm sure you must have one client that
> thinks it's a good buy at 10 p.
> AKEL – I probably do.
> MANDELL – You know what I mean, I mean you're gonna try and sell it
> at 16 p, there must be one guy that will buy it at 10 p.

(10/4/2006 Transcript at 4, Wolfe Aff., Ex. K-4; <u>see also</u> 10/6/2006 Transcript at 3,

Government's Mem., Ex. B.)

Mandell's argument based on the "illiquid" market for SKH and SKE stock

likewise fails to convince.  Mandell contends that "while their may be a close correlation

between the posted share price and what a share could be sold for on a U.S. Exchange,

that is not true for transactions on the AIM, which Dengler was investigating."

(Defendant's Reply at 8.)  Mandell argues that AIM has a different listing methodology

and offers a screen shot showing stocks traded on the AIM and on the United States Over

the Counter Market.  He explains that "[t]he screen shot shows that neither the current

prices posed for the AIM stocks, nor the bid or the ask prices, correspond to the 'actual

value' (to use to the government's phrase) or the current market activities.  The exhibit

shows that a stock that no one wanted to buy or sell posted a price at eleven times higher

than its 'actual value' in the market (zero)."  (<u>Id.</u> at 9.)  Not only is Mandell's math

wrong ($11 \times 0 = 0$), but the fact a stock may have a current or bid price on the AIM but

still not be trading does not undermine the information provided by Akel, which was

corroborated by various recorded conversations.  Mandell's arguments based on the

liquidity of Sky Capital stock and the functioning of the AIM may be appropriate for trial, but they fall well short of a substantial preliminary showing that Dengler omitted information for the Affidavit with reckless disregard for the truth.

The Affidavit disclaims any pretenses of completeness, stating that "[s]ince this affidavit is submitted for the limited purpose of obtaining a search warrant, I have not set forth each and every fact that I know concerning this investigation."  (Affidavit ¶ 2.) Dengler was not required to include "every piece of information gathered in the course of . . . [the] investigation."  Awadallah, 349 F.3d at 67-68.  While Mandell contends there were a high number of omissions, the volume of omissions is not controlling.  More to the point, they are not really omissions at all; and to the extent they are, they are largely irrelevant.   The omissions with some relevance are not so "clearly critical" that Dengler's reckless disregard for the truth can be inferred.  See Riley, 76 F.3d at 1280.  As Judge Karas explained, "[a]ll story telling involves an element of selectivity, so it is not shocking that every affidavit will omit facts which, in retrospect, seem significant." Vilar, 2007 WL 1075041, at *27 (citations and quotation marks omitted).  The omissions from Dengler's "story" – which was based on two cooperating witnesses, the statements of a defrauded investor, two undercover agents, and numerous incriminating recorded conversations – do not make out a "substantial preliminary showing" that Dengler "in fact entertained serious doubts as to the truth" of the allegations in the Affidavit.  Kunen, 323 F. Supp. 2d at 395. Since Mandell has failed to carry his burden to shows that Dengler omitted information from the Affidavit with reckless disregard for the truth, he is not entitled to a Franks hearing or suppression.

**B. Materiality**

For many of the same reasons Dengler's "reckless disregard for the truth" cannot be inferred from the complained of omissions, the omissions are not material, i.e., "necessary to the judge's probable cause finding." Salameh, 152 F.3d at 113.  Mandell argues that "[w]ithout the allegations tainted by material omissions, the affidavit rest solely on uncorroborated allegations and double and triple hearsay."  (Defendant's Mem. at 28.)  Not only does this assertion beg the question (it assumes that the omissions were "material"), but it is untrue.

With regard to misleading statements to investors, the information provided by Tappin was corroborated by the three other investors whose stories were relayed to Dengler via Figueora.  (Affidavit ¶ 12.)  The recorded conversations where Mandell and others appear to instruct brokers to be honest and comply with the law do not cancel out, as Mandell would have it, the information in the Affidavit indicating that investors were defrauded.  As explained, compliance (or feigned compliance) with the law some of the time, does not mean that the law was complied with all of the time.

The omissions pertaining to Dengler's allegation that investor's funds were misappropriated, and that Sky Capital was operated as a ponzi scheme, do not defeat probable cause.  The two recorded conversations which Mandell says show his "personal expenses" were carefully monitored say little, if anything, about the allegation that Mandell paid himself salaries and large bonuses when Sky Capital was losing money.  (Affidavit ¶ 40.)  While Dengler may have been mistaken as to whether the "50% payout" Akel referred to was a commissions or a share thereof, the affidavit describes

other instances where large, clearly excessive commissions were not disclosed to investors.  (Id. ¶ 42.)

As to stock manipulation at Sky Capital, Mandell's reliance on the omissions regarding the illiquidity of SKH and SKE stock and the functioning of the AIM do not foreclose a finding of probable cause.  The Affidavit sets forth the information provided by Akel regarding crossing stock and the "no net sales" policy.  This information was corroborated by recordings where Sky Capital employees referred to "cleaning up."  (Id. ¶¶ 49, 52.)  The conversations which Mandell claims explain that the market for SKH and SKE stock was illiquid (not that he crossed stock) do not call the specific instances of criminal conduct described in the Affidavit into question.  Mandell's argument based on the functioning of the AIM may be a defense at trial.  At the search warrant phase, however, the argument fails to undermine the detailed allegations of criminal conduct set forth by Dengler.

Considering to the "totality of the circumstances," the information omitted from the Affidavit was, at best, "potentially relevant."  Colkley, 889 F.2d at 301.  The omitted information was not, however, "such that its inclusion in the affidavit would defeat probable cause."  Id.  Since inclusion of the omitted information in the Affidavit would not defeat probable cause, Mandell's motion to suppress and for a Franks hearing is DENIED.

## II. Bill of Particulars

Rule 7(f) of the Federal Rules of Criminal Procedure authorizes the Court to "direct the government to file a bill of particulars" on the defendant's motion "before or within 10 days after arraignment or at a later time if the court permits."  Fed. R. Crim. P.

7(f).   "The decision to grant a bill of particulars is left to the discretion of the trial court." United States v. Russo, 483 F. Supp. 2d 301, 310-11 (S.D.N.Y. 2007) (citing United States v. Salazar, 485 F.2d 1272, 1278 (2d Cir. 1973)).

The standard for determining whether a bill of particulars is appropriate is based on necessity: "In deciding a motion for a bill of particulars, '[t]he important question is whether the information sought is necessary, not whether it is helpful.'"   United States v. Heredia, No. 02 CR. 1246(SWK), 2003 WL 21524008, at *9 (S.D.N.Y. July 3, 2003) (quoting United States v. Facciolo, 753 F. Supp. 449, 451 (S.D.N.Y. 1990)).   The purpose of a bill of particulars is to "supplement the allegations in the indictment when necessary to (1) enable the defendant to prepare his defense, (2) avoid unfair surprise to the defendant at trial, and (3) preclude a second prosecution of the same offense."   United States v. Sturtz, 648 F. Supp. 817, 819-20 (S.D.N.Y. 1986).   A bill of particulars is appropriate "only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused."   Torres, 901 F.2d at 234; see also United States v. Wilson, 493 F. Supp. 2d 364, 369 (E.D.N.Y. 2006) (quoting United States v. Walsh, 194 F.3d 37, 47 (2d Cir. 1999)).

A bill of particulars is not a discovery device and "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense."   United States v. Henry, 861 F. Supp. 1190, 1197 (S.D.N.Y. 1994); see generally United States v. Bellomo, 263 F. Supp. 2d 561, 580 (S.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's

investigation; obtain the precise way in which the government intends to prove its case; interpret evidence for the defendant, or disclose its legal theory.").

Mandell argues that the Court should order the Government to provide detailed particulars with respect to thirteen categories of information.  (Defendant's Mem. at 34-35.)  Generally, Mandell seeks the names of defrauded investors and the specific content of the alleged misrepresentations made to investors.  He argues that "given the scope of the alleged conspiracy, the number of investors allegedly involved and the scope of discovery in this case, the defendant cannot navigate the discovery and prepare a defense without the requested particulars."  (Defendant's Mem. at 31.)

"A defendant is not automatically entitled as a matter of right or under the Federal Rules of Criminal Procedure to a list of the names and addresses of the Government's witnesses prior to trial."  United States v. Ojeikere, 299 F. Supp. 2d 254, 258 (S.D.N.Y. 2004).  In similar cases, this Court has previously denied requests for bills of particulars specifying the names of defrauded investors.  See United States v. Russo, 483 F. Supp. 2d 301, 311 (S.D.N.Y. 2007); United States v. Zandstra, No. 00 CR 209(RWS), 2000 WL 1368050, at *4 (S.D.N.Y. Sept. 20, 2000).  As in Russo, Mandell's request for the names of investors "is simply a request to compel the production of the very type of evidentiary minutiae that is not appropriate in a bill of particulars."  Russo, 483 F. Supp. 2d at 311.

Mandell's request for information regarding material misstatements is completely unfounded.  The Indictment catalogs a number of falsehoods and omissions with great specificity.  (Indictment ¶¶ 16-26.)  Simply because, as Mandell argues, the Indictment states "and others" and "among other things," does not mean that the information

26

contained in the Indictment is insufficient to enable Mandell to prepare his defense.  The detailed information provided in the thirty-four page Indictment is more than sufficient.

Mandell complains of the massive amount of discovery in this case.  But, while the Government can "not fulfill its obligations merely by providing mountains of documents to defense counsel," United States v. Lino, No. 00 Cr. 632(WHP), 2001 WL 8356, at *4 (S.D.N.Y. Jan. 2, 2001), the mere existence of "mountains of documents" does not entitle Mandell to a bill of particulars.  Given the specificity of the allegations in the Indictment, which fully apprise Mandell of the crimes with which he is charged, the amount of discovery is of little import.  The Court notes that substantially all of the Government's discovery comes from Sky Capital's files which were the object of the search and seizure.  The Government has made discrete productions of approximately 32 boxes of material, and has confirmed that its evidence at trial will consist primarily of the materials in the 32 boxes.  In addition, further information dealing with investors and investments will be provided at a date closer to trial.

Mandell falls far short of showing that a bill of particulars is "necessary" to enable him to prepare is defense and to avoid unfair surprise at trial.  Sturtz, 648 F. Supp. at 819-20.  Mandell's motion for a bill of particulars is an ill-disguised attempt at discovering information to which he is not entitled and is accordingly DENIED.

## Conclusion

For the forgoing reasons, Mandell's motions to suppress and for a bill of particulars are DENIED.  The Court will hold a conference on Thursday, May 20, 2010 at 3:30 PM in Courtroom 9B to discuss further motions, if any, to set the date for the final pretrial conference as well as a trial date.  The time between now and May 20, 2010 is

excluded. See 18 USC § 3161(h)(7)(A). The time excluded is necessary to continue

defendants preparation for trial.


Dated: New York, New York
       April 30, 2010


                                        SO ORDERED

                                        _____
                                        PAUL A. CROTTY
                                        United States District Judge