USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: March 16, 2011

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA

(S1) 09 Cr. 0662 (PAC)

- against -   ORDER

ROSS MANDELL, STEPHEN SHEA,
ADAM HARRINGTON a/ka/ "Adam Rukdeschel,"
ARN WILSON, ROBERT GRABOWSKI and
MICHAEL PASSARO

Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

HONORABLE PAUL A. CROTTY, United States District Judge:

Defendants Mandell and Harrington move to dismiss the superseding indictment charging them with (1) a conspiracy to commit securities fraud, wire fraud, and mail fraud, in violation of 18 U.S.C. § 371; (2) securities fraud in violation of 15 U.S.C. § 78j(b) and 78ff, and Title 17 C.F.R. §240.10(b)5; 18 U.S.C. § 2; (3) wire fraud in violation of 18 U.S.C. § 1343 and 2; and (4) mail fraud in violation of 18 U.S.C. § 1341 and 2.  Alternatively, defendants seek preclusion of evidence of extraterritorial transactions.  Defendants also move for relief under the statute of limitations; as well as disclosure of particulars concerning (a) witnesses; (b) out of court statements by co-conspirators and (c) documents to be used as exhibits at trial.

**Allegations in the Superseding Indictment**

The superseding indictment alleges that defendants Mandell and Harrington used Thornwater Company ("Thornwater") to solicit investors to purchase private placement shares in U.S. companies.  (Sup. Ind., ¶¶ 7-8.)  Thornwater was a licensed broker-dealer and a member of NASD, with offices at 99 Wall Street, New York, New York.  Thornwater commenced in March

1994 and continued its operations until it closed in February 2003. (Sup. Ind., ¶ 6.) None of these Thornwater ventures resulted in a sale of securities in a public offering and the investors in the private placements never received the money they had been promised. (Sup. Ind., ¶ 21.) Instead, defendant Mandell misappropriated funds and starting in 2001, recreated Thornwater under the name of Sky Capital. (Sup. Ind., ¶ 1.) Mandell was an undisclosed principal of Thornwater and he exercised day-to-day control over Thornwater and its employees. (Sup. Ind., ¶ 8.)

Sky Capital Holdings is a Delaware Corporation, whose stock was traded on the Alternative Investment Market ("AIM") of the London Stock Exchange, during the period from July 2002 to late 2006. (Sup. Ind., ¶1.) Sky Capital Holdings had a number of affiliates, subsidiaries and related entities. Among them are Sky Capital LLC, a limited liability company, organized under New York law. In May 2002, Sky Capital LLC obtained broker-dealer approval from NASD. In 2004, Sky Capital LLC opened offices in Boca Raton, Florida and Red Bank, New Jersey purportedly to offer, inter alia, brokerage services and equity and fixed income trading. (Sup. Ind., ¶ 2.)

Sky Capital Holdings also founded Sky Capital UK Limited. It was a wholly-owned subsidiary, with its principal place of business in London. It offered brokerage services and institutional sales and trading. (Sup. Ind., ¶ 3.)

Finally, Sky Capital Holdings also formed Sky Capital Enterprises Inc., a venture capital firm that purported to provide strategic advice and financing to small and medium size start-up and early stage companies. Sky Capital Enterprises Inc. was incorporated under Delaware law under the name Sky Venture Capital Inc. Sky Capital Enterprises Inc.'s stock was publicly traded on the Alternative Investment Market. (Sup. Ind., ¶ 4.)

All the Sky Capital Companies (Sky Capital Holdings, Sky Capital LLC, Sky Capital Enterprises, and Sky Capital UK) were affiliated and, with the exception of Sky Capital UK, had their primary place of business at 110 Wall Street, New York, New York (Sup. Ind., ¶¶ 3, 4, 5.), a few doors away on Wall Street from Thornwater's address.

Mandell controlled these Sky companies. Given his disciplinary history in the securities industry, Sky Capital agreed, as a condition of its membership in NASD, that Mandell would neither supervise nor hold a supervisory position. Notwithstanding that promise, Mandell had day-to-day management control of the Sky companies. (Sup. Ind., ¶ 7.) Harrington was a registered broker, first at Thornwater, and then at Sky Capital. He was a senior broker at Sky Capital LLC and an active participant in the deceptive scheme. (Sup. Ind., ¶ 12.)

According to the indictment, during the cross-over period, as Thornwater phased out and Sky Capital phased in, Thornwater raised capital for two Sky ventures; and it also pushed investments in Dorchester Holdings. Investors were promised that their Dorchester shares would be exchanged "one-to-one" for Sky Capital Holdings which would be issued at a higher value. None of this happened. The private placement memorandum for Dorchester Holdings stated that funds would be used to make subordinated loans to Sky Capital. Instead, the funds were diverted to Sky Capital not as loans, but as direct payments, enriching the two individual defendants, among others. (Sup. Ind., ¶¶ 21-25.) When investors complained, some received shares in a subsequent private placement—which also turned out to be worthless—or other forms of compensation which defendants received from other subsequent investors. (Ibid.)

According to the indictment, Sky Capital continued these schemes. Defendants conducted a series of private placements for Sky Capital Holdings which resulted in its shares being issued. Defendants also offered private placements related to GlobalSecure, a Delaware

Company with its principal place of business in Silver Springs, Maryland. GlobalSecure was formed after the terrorist attack and provided products and services for the homeland security industry. Mandell controlled GlobalSecure and served on its Board of Directors. (Sup. Ind., ¶¶ 27, 9.)

In addition to using assets held by Sky Capital to invest in GlobalSecure, defendants pursued the same course of action with Advanced Spinal Technologies Inc., a Delaware Corporation, with its principal place of business in Boca Raton, Florida. Advanced Spinal Technologies, Inc. is an affiliate of Sky Capital Enterprises and like GlobalSecure, it was founded by Mandell, who served on its Board of Directors. (Sup. Ind., ¶¶ 28, 11.)

Mandell and Harrington pumped up sales in Sky Capital Holdings and Sky Capital Enterprises by offering these stocks at prices "discounted" from the quoted price for the stocks on the Alternative Investment Market of the London Stock Exchange. The quoted price, however, was artificially inflated, and the price maintained by various fraudulent schemes and devices. (Sup. Ind., ¶ 29.) Investors were also induced to purchase and hold Sky Capital Holdings and Sky Capital Enterprises by false representations that the stock prices were about to increase substantially. These "liquidity" events were said to be imminent, but in fact they were not. (Sup. Ind., ¶ 30.) Investors were solicited by cold-calls and typically were touted on to non-Sky Capital stocks that traded on the New York Stock Exchange or NASDAQ. After this grooming, investors were introduced to the wonders of the Sky Capital family of products. They could trade in these stocks or obtain private placements of Sky Capital Holdings, Sky Capital Enterprises or GlobalSecure. (Sup. Ind., ¶ 31.) The market price of Sky Capital Holdings and Sky Capital Enterprises was artificially raised and maintained by a series of schemes, including failure to execute sales orders; adopting a "no net sales" policy where no Sky product could be

sold, unless it was matched with a buy order; Sky Capital Holdings and Sky Capital Enterprises were improperly "crossed;" the stocks were parked; critical unauthorized purchases and sales were made; customers were encouraged to liquidate their non-Sky Capital brokerage accounts so that they would have money to purchase more Sky Capital Holdings or Sky Capital Enterprises. Taken together, and with other means and methods, Mandell and Harrington created the false appearance of a market for Sky investment products at prices which were artificially inflated and maintained. (Sup. Ind., ¶ 32.)

Brokers for these Sky transactions were given excessive and undisclosed payments, well in excess of ordinary, legitimate brokerage fees. The payments to brokers were recorded as advances, loans and special bonuses. No investor was advised of this excess compensation. (Sup. Ind., ¶ 33.) Money to finance these payments was obtained by buying Sky products from investors at a discounted price and selling the same stock to different Sky investors creating false profits which would then be distributed as part of the scheme to bribe brokers. (Sup. Ind., ¶ 34.) The money invested in the Sky companies was not used to generate a return on investment, but rather to enrich Mandell and Harrington and to pay and bribe brokers for encouraging investors to purchase Sky Capital Holdings and Sky Capital Enterprises. (Sup. Ind., ¶ 35.)

The superseding indictment charges that the conspiracy started in 1998 and continued through 2006. Much of the conduct occurred in New York City and the United States. The Sky family of companies and affiliates were all domestic corporations, with the exception of Sky Capital UK. Trades in Sky Capital Holdings and Sky Capital Enterprises were executed on the Alternative Investment Market of the London Stock Exchange. The shares were listed when Mandell was restricted from participating in Thornwater's and Sky Capital's brokerage business here in the United States. Some stock in those two entities was issued in private placements. At

all times, this scheme was run from the United States, which was defendants' base of operations. Money generated overseas was sent to the United States. All investor accounts were maintained at the brokerage office in New York. Many of the defrauded investors were in the United States and the stock manipulation occurred here in the United States.

**Procedural History**

The original indictment was returned on June 30, 2009. On June 24, 2010, the Supreme Court decided Morrison v. National Australia Bank Ltd., ___ U.S. ___, 130 S.Ct. 2869 (2010), which deals with the extraterritorial application of the 1934 Exchange Act. On December 14, 2010, the Government filed a superseding indictment which added mail and wire fraud counts to the original indictment.

**Defendants' Motion with Regard to Extraterritoriality**

Both Mandell and Harrington move to dismiss the indictment based on the Supreme Court's decision in Morrison, arguing that the anti-fraud provisions of the Securities Exchange Act do not apply extraterritorially. Since the superseding indictment alleges fraud in connection with the sale or purchase of shares listed on the Alternative Investment Market of the London Stock Exchange, Harrington argues that all aspects of the indictment that allege fraud with regard to securities listed on that exchange and/or occurred outside the United States must be dismissed (Bachner Declaration, January 10, 2011, para. 6). Alternatively, any evidence of transactions on the foreign exchange must be precluded. According to Mandell, Morrison means that the anti-fraud provision of the Securities Exchange Act reach manipulative and deceptive devices, only when there is a purchase or sale of a security listed on a United States exchange. The Securities Exchange Act cannot regulate businesses and transactions conducted on foreign securities exchanges. (Mandell Memorandum in Support of Motion, January 10, 2011, pg. 3-4.)

In Morrison, foreign plaintiffs sued foreign defendants for misconduct in connection with securities traded on a foreign exchange.  The gravamen of the Australian plaintiffs' complaint was that an Australian bank bought a Florida land mortgage servicing company which had misrepresented its future income.  When interest rates fell, the Florida company was forced to restate its earnings.  This in turn caused a decline in the price of shares of the Australian bank, which were traded on the Australian exchange.  Judge Jones dismissed the complaint.  In re: National Australia Bank Securities Litigation, 03 Civ. 6537 (BSJ), 2006 WL3844465 *8 (S.D.N.Y. 2006) (the acts in the United States were "at most, a link in the chain of an alleged overall securities fraud scheme that culminated abroad").  The Second Circuit affirmed.  547 F.3d at 175-176 (the acts performed in the United States did not "compris[e] the heart of the alleged fraud.").

The Supreme Court affirmed 8-0, but 5 of the Justices adopted a rationale different from the "conduct and effects"[1] test used by the District Court and the Circuit Court.  The new rationale, applied in a civil case where the parties had only de minimis contact with the United States and no contact with a United States exchange, held that 10(b)(5) "does not punish deceptive conduct but only deceptive conduct 'in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered.'"  130 S.Ct. 2869, 2884.

**Analysis of Morrison Argument**

The superseding indictment alleges a securities, wire and mail fraud conspiracy with respect to "Sky Capital and other securities."  (Sup. Ind., ¶¶ 37-40.)  It is not limited to Sky Capital.  With respect to "Sky Capital and other securities," substantial and material amounts of

---

[1] The "conduct and effects" test asks whether the wrongful "conduct" occurred in the United States and whether such "conduct" had a substantial effect in the United States or upon its citizens.

overt activity occurred in New York, where Mandell and Harrington allegedly engaged in their "manipulative and deceptive devices." (Sup. Ind., ¶¶ 43-48.) The manipulative and deceptive devices involved companies which were organized in the United States. All money was controlled here in the United States. These allegations do not require extraterritorial application of United States laws; the crimes were committed here.

Second, it is dubious whether <u>Morrison</u> is applicable to the facts alleged in the superseding indictment. <u>Morrison</u> involved Australian investors, who had purchased shares in an Australian bank on an Australian exchange. The sole connection with the United States was the Australian bank's interest in a Florida mortgage service company which had misrepresented its earnings. When the Florida company restated its earnings, the prices of the Australian bank, trading on the Australian exchange, declined. <u>Morrison</u> is a far cry from the conduct alleged here. The alleged conduct is not limited, as defendants so hopefully suggest, to transactions on the Alternative Investment Market of the London Stock Exchange. Rather, it deals with a very broad range of alleged fraudulent, manipulative and deceptive practices and schemes which were orchestrated from and occurred here in the United States. Not all of the stock transactions involved Sky securities and some of the Sky transactions were private placements here in the United States. Indeed, it may be inferred that execution of the foreign trades was ancillary to the fraudulent scheme being conducted here in the United States.

There is another distinction which is important. <u>Morrison</u> dealt with Australian nationals who invested in an Australian company, which traded on an Australian exchange. Here we deal with United States citizens, doing business here in New York and the United States, with United States companies, some of which were traded on a foreign exchange. There is no apparent reason—and certainly no good reason—why the fraudulent and manipulative schemes charged

here should not be prosecuted because some trades, which were actually part of the fraudulent and manipulative schemes, were executed on a foreign exchange. The securities, mail and wire fraud statutes are designed to protect United States citizens from such schemes. Contrary to defendants' suggestion about extraterritorially, the United States is free to protect its citizens from fraud. United States v. Bowman, 260 U.S. 94 (1922). Recently, the Second Circuit applied a criminal statute extraterritorially; holding, as here, that a contrary conclusion "would severely diminish the statute's effectiveness." U.S. v. Weingarten, 2011 WL135763 at *6 (January 18, 2011).

In addition to the securities fraud, the mail and wire fraud statutes are applicable here as well, even if some of the fraudulent and manipulative transactions occurred abroad. In Pasquantino v. United States, 554 U.S. 349, the defendants ordered liquor over the phone from a store in Maryland. At the time of placing the order, the defendants intended to smuggle the Maryland liquor into Canada, and to deprive the Canadian government of tax revenue. The Supreme Court held, in an ironic reversal of the direction of the liquor trade from the days of Prohibition, that the defendants' offense "was complete the moment they executed the scheme inside the United States"; and "this domestic element" justified the prosecution. Id. at 371. It is clear that the mail and wire fraud statutes cover alleged crimes, even if there is foreign conduct.

Similarly to Pasquantino, Mandell and Harrington sold shares in United States companies to United States citizens. Mandell controlled the Sky companies, its affiliates, and the Wall Street brokerage firm, all of which was central to implementing the fraudulent and manipulative scheme. Money was raised in the United States, and not used for legitimate investment purposes, but rather diverted to Mandell's, Harrington's, and their associates' private use here in the United States. The fact that defendants engaged in some conduct abroad does not mean that

that conduct and conduct here in the United States is not covered by the mail and wire fraud statutes. This is especially so here because the transactions which occurred abroad are the last step to give effect to the crime charged.

Mandell and Harrington operated in the United States; the securities offered were in United States companies; even when there were foreign investors or there were private placements with foreign investors, all money and signed documents were returned to the United States; and all investors' accounts were maintained at the Wall Street Brokerage firm. Further, the brokerage firm refused to make certain trades; crossed trades; parked stock; and made unauthorized purchases and sales of stock, all designed to create the false appearance that there was a market. The use of a foreign exchange, which perhaps has lighter or reduced regulation, should not be allowed to exempt the crimes charged in the superseding indictment from prosecution. The mail and wire fraud statutes are applicable and are broad enough to cover all the conduct alleged in the complaint.

In light of the foregoing, the Court need not pass on the applicability of the recent Congressional amendment to the Securities Exchange Act, made in the wake of the <u>Morrison</u> decision.

**Statute of Limitations**

Both Mandell and Harrington argue that the superseding indictment, which added wire and mail fraud counts, broadened the charges so that the statute of limitations was not tolled until December 14, 2010. This is incorrect. The original indictment charges a conspiracy to commit securities, mail and wire fraud and securities fraud. The superseding indictment repeats the conspiracy charges and charges each object of the conspiracy as a separate crime. There are no new facts alleged; the overt acts remain the same; and there is no broadening of the core

allegations.[2] Accordingly, the superseding indictment relates back to the date of the first indictment—June 30, 2009.

Further, Mandell's argument that proof should be limited to conduct occurring within five years of the indictment, is also incorrect. The statute of limitations is not an evidentiary bar. The Government is free to offer relevant evidence of the conduct alleged in the indictment, provided that one act occurs within the limitations period.

Harrington's argument is more intricate. His argument assumes (1) the statute did not toll until the date of the superseding indictment (December, 2010), and (2) the superseding indictment does not relate back to the date of the original indictment (June 2009); and (3) his September 1, 2005 resignation from the Sky Capital broker-dealer counts as an affirmative withdrawal from the conspiracy. Based on these assumptions, he concludes he may not be prosecuted. This "if-wishes-were-horses-no-beggars-would-walk" approach to legal analysis cannot be correct. It is wrong in its particular assumptions: The superseding indictment of December, 2010 relates back to the initial indictment of June 30, 2009; and 2005 resignation from the broker-dealer is not the same as withdrawal from a conspiracy. Since we are dealing with a 5-year statute of limitations, Harrington is certainly responsible for his conduct back to June 30, 2004, which antedates his departure by approximately 14 months. Harrington's argument at this stage is little more than wishful thinking and is rejected. He is, of course, free to raise a withdrawal defense at trial, if he has facts to support the argument. His departure from the Sky Capital broker-dealer by itself, however, is insufficient.

---

[2] Mandell's argument that the disclosures of particular documents and transactions, which he sought, have broadened the charges, is wide of the mark. Obviously, there are many documents which may prove the charges, but that does not mean the charges themselves have broadened.

**Harrington's Motion to Sever**

>Rule 8(b) of the Fed. R. Crim. P. provides that:
>
>>The indictment . . . may charge 2 or more defendants if they are alleged to have participated . . . in the same series of acts or transactions constituting an offense or offenses.
>
>Rule 14(a) of the Fed. R. Crim. P. provides that:
>
>>If the joinder of . . . defendants in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires.

The Court starts from the premise that both the indictment and superseding indictment arise out of a common scheme of plan. While it is clear that Mandell is a leader, that does not mean that Harrington did not play a role in the crimes charged. Indeed, Harrington is alleged to be "one of the more senior brokers at Sky Capital LLC, and an active participant in soliciting customers to purchase Sky Capital securities and directing other brokers to do the same." (Sup. Ind., ¶ 12.) Both Harrington and Mandell are charged with being joint participants in a common scheme, a role itself that is sufficient to justify Harrington's joinder. U.S. v. Feyrer, 333 F.3d 110, 114 (2d Cir. 2003); U.S. v. Salameh, 152 F.3d 88, 115 (2d Cir. 1998).

Since it is appropriate to join the defendants here, Harrington is not entitled to the relief he seeks. Of course, proof against one defendant can be used against another defendant charged in a conspiracy count; but this is not the prejudice which justifies severance. Severance might be appropriate where proof "inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper." Salameh, 152 F.3d at 115.

Harrington is concerned about consensual recordings made by cooperating witnesses which might incriminate others, but not him. (Harrington Brief, pg. 20.) The Government admits that these recordings were made as late as 2006; and Harrington left Sky Capital in

12

September, 2005. (Harrington Brief, pg. 24.) But as previously indicated, termination of employment does not equal withdrawal from the conspiracy. The recordings may very well be admissible against Harrington, if he did not withdraw from the conspiracy. Furthermore, evidence which is admissible against one defendant, but not another, does not require severance.[3]

**Additional Discovery**

    (1)    Exhibit Lists

Much of the proof of the charged conduct will be based on mailings and wire transmissions. The volume of discovery material at issue here is substantial. Any concern about volume, however, can be addressed by timely production of an exhibit list. Accordingly, the Government is directed to produce its exhibit list three weeks before trial.

    (2)    Identification of Co-conspirators and their Out of Court Statements

Requests of this nature are not ordinarily granted. The Government is not required to disseminate how it intends to establish the elements of the offenses charged, or to preview its legal theories. Given the volume of such materials, however, and to facilitate the conduct of an orderly trial, the Government is directed to produce its 3500 materials, including impeachment material, three weeks before trial and to continue with that production so that defendants have three weeks advance notice of any such materials for each witness.

---

[3] On February 25, 2011, counsel for Harrington supplemented the motion for severance. Counsel asserted that he has a full trial calendar and the schedule set for his trial here in the Southern District caused inconvenience elsewhere. Whatever else may be said about counsel's trial obligations to another client in a separate proceeding, it is no reason to grant a severance, pursuant to Rule 14 Fed.R.Crim.P.

The foregoing constitutes the Order of this Court.

Dated: New York, New York
March 16, 2011

SO ORDERED

*[signature]*

PAUL A. CROTTY
United States District Judge