UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
                                          :

UNITED STATES OF AMERICA,          :      Docket No. 09 CR 662
                                            :

      -against-                    :
                                            :

ROSS MANDELL,                       :
                                            :

          Defendant.                :
                                            :
------------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF ROSS MANDELL'S MOTION FOR BAIL PENDING APPEAL AND FOR THE <u>APPOINTMENT OF CJA COUNSEL TO LITIGATE THIS MOTION</u>

HOFFMAN & POLLOK LLP
260 MADISON AVENUE
NEW YORK, NEW YORK 10016
T. (212) 679-2900
F. (212) 679-1844
SCWOLFE@HPPLEGAL.COM


MATTHEW W. BRISSENDEN, P.C.
Counsel for Ross Mandell
666 Old Country Road, Suite 501
Garden City, NY 11530-2004
(516) 683-8500
Of Counsel for purposes of this motion

Counsel for Ross Mandell submits this Memorandum of Law in support of his motion, pursuant to 18 U.S.C. § 3143(b), for bail pending appeal.  In doing so, we rely upon and incorporate by reference all of the Defendant's prior submissions with respect to his Rule 29 and Rule 33 motions, *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010), and the Speedy Trial Act.

As a preliminary matter, we also move to be relieved as counsel for Mr. Mandell in this court and for the appointment in our stead of Matthew Brissenden, Esq. under the Criminal Justice Act.  We refer the court to our letter dated May 5, 2012 filed under seal, attached to which was a proposed Notice of Appearance from Mr. Brissenden pending his CJA appointment. Concurrently with this motion, we are filing a motion in the Court of Appeals to be relieved as Mr. Mandell's counsel in that Court and for the appointment of Mr. Brissenden as Mr. Mandell's appellate counsel.   In the alternative, we request that Mr. Brissenden be appointed as our co-counsel in this court under the Criminal Justice Act pending resolution of the motion in the Court of Appeals.

## **MOTION FOR BAIL PENDING APPEAL**

Bond pending appeal pursuant to 18 U.S.C. § 3143(b)(1) should be granted where the Court determines that: (A) the person is not likely to flee or pose a danger to the safety of the community, and (B) that the appeal is not for the purpose of delay, but will raise a substantial question of law or fact likely to result in (i) reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of imprisonment, or (iv) a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the

1

appeal process.

In the present case, we respect the fact that the Court has previously ruled against the Defendant with respect to the issues which will form the basis of his appeal. To grant the relief which the Defendant seeks, however, the Court need not hold "that its own judgment is likely to be reversed on appeal." *United States v. Randell*, 761 F.2d 122, 124 (2d Cir. 1985). As the Second Circuit has explained, "we do not believe [Congress] intended either to eliminate bail pending appeal or make such bail dependent upon 'the willingness of a trial court to certify' that it is likely to be reversed." 761 F.2d at 124 (quoting *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985). Instead, a "substantial question of law or fact" is "one of more substance than would be necessary to a finding that it was not frivolous." *Randell*, 761 F.2d at 125 (quoting, with approval, *United States v. Giancola*, 754 F.2d 898, 901 (11th Cir. 1985)). "It is a 'close' question or one that very well could be decided the other way." *Id.*

Because there are several such significant appellate issues in the instant matter, and because Ross Mandell clearly does not pose a flight risk or a danger to society, we are respectfully asking the Court to grant the instant application for bond pending appeal.

## I.    ROSS MANDELL IS NOT A FLIGHT RISK OR A DANGER TO SOCIETY

Mr. Mandell is not a flight risk. He lives at home with his wife and two young daughters, and is currently released subject to a $5,000,000 bond, which is secured by the home where his family lives and the home of his in-laws, Carmine and Giovannia Sarno, as well as $20,000 cash. His wife, mother, and stepfather have also signed as suretors, and his mother and step-father have posted their home, a luxury condominium in Manhattan. He is subject to electronic monitoring and wears a GPS location monitor at all times. He and his immediate family

2

members have surrendered all travel documents. Mr. Mandell has neither the ability nor the inclination to flee this Country, or to do anything else that would endanger the welfare of his wife and children, who are his first priority.

Mr. Mandell has scrupulously complied with all of the conditions of his release, and has been present at all required appearances, including sentencing, where he knew that the Government was seeking his remand. While the Government may argue that his incentive to flee has increased now that the Court has imposed a sentence of 12 years incarceration, that sentence is in fact, much lower than the effective *life* sentence that was recommended by Probation, and which Mr. Mandell had reason to expect when he appeared before Your Honor at sentencing. As a result, his motive to abscond has, if anything, decreased, now that he knows that he is not facing life imprisonment.

Finally, the Government acknowledged in the context of prior bail proceedings that Mr. Mandell is not a danger to the community. As mandated by the Court, Mr. Mandell no longer has any involvement in the securities industry. If anything, there is a net social benefit to be gained from his release during the pendency of his appeal, insofar as Mr. Mandell continues to volunteer as a suicide hot-line counselor, and as an active sponsor and leader in the A.A./N.A. community. As Your Honor will recall, at sentencing, the Court received more than 100 letters from persons all over the country, many of which discussed in detail his extraordinary good deeds and extensive contributions to society. Leaving Mr. Mandell free on bond would permit him to continue this valuable work, while posing no risk to society.

## II.   THE APPEAL OF THIS MATTER WILL RAISE SUBSTANTIAL LEGAL ISSUES LIKELY TO RESULT IN A NEW TRIAL OR REVERSAL

In its brief, appellate counsel will raise several significant legal issues set forth herein, all of which were previously raised and properly preserved during trial.   Among other things, counsel will argue: (1) that the Court's charge, combined with the extensive evidence relating to alleged fraudulent transactions in the United Kingdom, improperly permitted the Jury to convict the defendants based upon foreign securities transactions, in violation of the Supreme Court's holding in *Morrison v. National Australia Bank Ltd.*, 130 S.Ct. 2869 (2010); (2) that the Court improperly instructed the jury that it need not find an actual material misrepresentation with respect to Counts 3 and 4; (3) that the Government's "material omission" theory of liability was unsupported by the facts or the case law; and (4) that the Defendant's speedy trial rights were violated.

### A.   The Supreme Court's Decision in *Morrison v. National Australia Bank Ltd* Raises Substantial Questions of Law on Appeal

#### 1.   The Court Applied an Incorrect Standard to Determine Whether the Alleged Conduct Was Extraterritorial

In June of 2010, the United States Supreme Court decided *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010), where it applied the presumption against extraterritoriality to conclude that Congress did not intend the Securities and Exchange Act of 1934 to apply to securities transactions outside of the United States.   In particular, *Morrison* involved a civil action under 15 U.S.C. § 78j(b), brought by foreign plaintiffs against both foreign and American defendants, which alleged deceptive conduct (occurring both in and outside of the United States) effecting the value of shares traded exclusively on foreign exchanges.

4

The Second Circuit had previously dismissed the case, holding that United States courts lacked subject matter jurisdiction to hear the dispute.  In *Morrison* the Supreme Court affirmed the dismissal, *not* based upon a lack of subject matter jurisdiction, but rather based upon the plaintiff's failure to state a claim under Rule 12(b)(6).  In particular, the Court held that: (1) Rule 10(b) of the Exchange Act does not apply extraterritorially, given the presumption *against* extraterritoriality, and the lack of any clear Congressional statement sufficient to overcome the presumption; and (2) that the alleged facts of the case – including allegations of deceptive conduct originating in the United States, were not sufficient to find a domestic fraud under Rule 10(b).

In reaching this conclusion, the Court explicitly rejected the suggestion that a domestic application of Rule 10(b) could be based upon "the place where deception originated", or a finding that "the fraud involves significant conduct in the United States that is material to the fraud's success." *Id.* at 2884, 2887-2888.    Instead, it emphasized that a domestic fraud under Rule 10(b) *only* applies where there is a domestic security transaction, meaning either: (a) the security is registered on a domestic exchange; or (b) where a non-registered security is purchased within the United States.[1]

---

[1]    As to this second category, the Second Circuit has recently provided additional clarification regarding when a non-registered security transaction takes place inside the United States.  According to the Second Circuit, it is not sufficient to demonstrate that the broker was located in the U.S., or that the securities in question were issued by a U.S. company.  Rather, the Second Circuit held that to demonstrate a domestic transaction, it must be shown that the parties incurred irrevocable liability within the U.S. – that the purchaser incurred irrevocable liability within the U.S. to take and pay for a security, or the seller incurred irrevocable liability within the U.S. to deliver a security.  In the alternative, the Second Circuit stated that a sale of securities could be understood to take place at the location in which title is transferred. *See Absolute Activist Value Master Fund v. Ficeto,* 672 F.3d 143 (2d Cir 2012

Following the *Morrison* decision, defense counsel moved for the dismissal of all counts in the Indictment. The Court expressed doubt as to whether *Morrison* applied to the facts of this case. The Court reasoned that *Morrison* involved "Australian investors, who had purchased shares in an Australian Bank on an Australian Exchange." By contrast, the Court stated, the instant case "deals with a very broad range of alleged fraudulent, manipulative and deceptive practices and schemes which were orchestrated from and occurred here in the United States." The Court further noted that the defendants were U.S. citizens, that the companies at issue were organized in the United States, and that the money was controlled from the United States. As a result, the Court concluded that "these allegations do not require extraterritorial application of United States laws; the crimes were committed here." *See* March 16, 2011 Order, pp. 7-8.

We respectfully submit that this analysis was flawed. The threshold issue should have been whether or not 15 U.S.C. 78j(b) applies to extraterritorial transactions in a criminal context – an issue which the Court failed to squarely address.[2]

Assuming that it *does not* apply extraterritorially (and indeed, given the holding in *Morrison*, there is no reason to believe it should), the Court's next step should have been to determine whether or not the securities transactions here were domestic in nature. As *Morrison*

---

[2] On this point, the Government had argued (but the Court did not adopt the argument) that the presumption against extraterritoriality simply does not apply to criminal statutes, given the Supreme Court's holding in *United States v. Bowman*, 260 U.S. 94, 97 (1922). As defense counsel argued at the time, the Government's argument substantially over-reads the holding of *Bowman*. *Bowman* did not hold that the presumption against extraterritoriality is inapplicable to criminal statutes; to the contrary it recognized and applied that presumption to the facts of the case. *See* Zachary Clopton, *Bowman Lives: The Extraterritorial Application of U.S. Criminal Law after Morrison v. National Australia Bank*, papers.ssrn.com/sol3/papers.cfm?abstract_id=1807205. Instead, the *Bowman* Court narrowly found that where a criminal statute is specifically designed to prosecute crimes committed against the Government of the United States (as opposed to its private citizens), an extraterritorial intent may be inferred to overcome the presumption. *See id.* at p. 33.

explicitly warned, the relevant inquiry *should not* have been whether the fraud originated in the United States, or whether substantial fraudulent conduct took place here.  Unfortunately, these were the very factors which the Court focused upon in deciding that this case did not involve an extraterritorial application of Rule 10(b).

As set forth in more detail below, we believe that if the Court had properly applied the *Morrison* "location of the transaction test", it would have inevitably reached the conclusion that most, if not all of the transactions covered at trial, took place overseas.

## 2.   The Majority of Transactions Were Foreign, Not Domestic

The alleged fraud took place over eight years, and likely involved thousands of discrete transactions, some of which may have occurred in the United States, but the majority of which clearly did not.  Indeed, the fraudulent conduct which allegedly occurred in the United Kingdom was far more extensive than the Government was willing to concede for purposes of the *Morrison* argument.  At trial, the Government alleged the following:

- that from the very beginning of the alleged fraud at Thornwater, the defendants preferred and sought out English customers (TR 517; 611 TR 3448);

- that the defendants repeatedly made false and misleading representations to these English investors about numerous stock offerings and private placements (TR 3449);

- that Mandell directed his employees to travel to London to sell shares in the Sky IPO, and to make false representation to investors while in London (TR 3462);

- that the defendants caused Sky Capital Holdings and Sky Capital Enterprises to become listed on the Alternative Investment Market in London, and thereafter manipulated the prices of those publicly traded securities (TR 3466-3470);

- that the defendants sold private placement shares in Sky and Global Secure, while promising investors that the shares would be listed on the Alternative Investment Market (TR 3445);

- that Mandell opened a Sky Capital office in London to further the fraudulent

7

scheme (3462);

- That Mandell offered bribes to his employees while they were in England in the form of perks and cash bonuses (TR 1349-1353; 3463-3465), and then failed to disclose these bribes to their predominantly English investors (TR 3501).

At trial, the Government called three English investors to testify as victims. Each of them testified that they invested in Sky Capital and Global Secure private placements based not merely upon telephone solicitations from the United States, but also based upon multiple in-person meetings which took place in London. *See* testimony of Stewart Grassie (TR 1007), Sean Costelloe (TR 1590), and Barry John Whitehead (TR 2903). Likewise, the vast majority of victim letters received at sentencing were from English investors.

The private placement memoranda issued to these and other U.K. investors in connection with the sale of Sky Capital Holdings, Sky Capital Enterprises and Global Secure made it clear that the securities were being offered by a U.K. broker (Sky Capital UK Limited) and Nominated Advisor (Grant Thorton Corporate Finance), for purchase in the U.K. only. Indeed, the U.K. "Offers for Subscription" generally included language to the effect that:

> This document does not constitute an offer to sell or the solicitation of an offer to buy shares in any jurisdiction in which such offer or solicitation is unlawful and, in particular, is not for distribution into the United States or Canada. The Common Shares have not been and will not be registered for the purposes of this Offer under the applicable securities laws of the United States or Canada. The distribution of this document in other jurisdictions may be restricted by law and therefore persons into whose possession this document comes should inform themselves about and observe any such restriction. Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdiction. Furthermore, because the Common Shares have not been registered in the United States pursuant to the US Securities Act or under any state securities laws, the Common Shares may not be offered or sold within the United States or to, or for the account or benefit of, any US persons (as defined in Regulation S promulgated under the US Securities Act).

****

8

The New Common Shares are subject to transfer restrictions in order to ensure compliance with US securities legislation which prevent sale into the US or to US persons other than in certain limited circumstances for a period of 2 years.

\*\*\*\*

The New Common Shares will not be registered under the US Securities Act or qualify under any US state securities laws and, thus, may not be offered or sold in the United States or to, or for the account or benefit of, any US persons as defined in Regulation S under the US Securities Act. Accordingly, the Offer is being made in reliance on Regulation S under the US Securities Act to non-US persons in off-shore transactions. The New Common Shares are subject to the restrictions on transfer set out in Part VI of this document including a restriction against hedging transactions involving the New Common Shares unless conducted in compliance with the US Securities Act, and share certificates will be endorsed with reference to such transfer restrictions. Regulation S under the US Securities Act prohibits the resale or re-distribution of the New Common Shares sold in the UK Offer into the US or to a US Person (as defined therein) for a period of one year from the Closing Date. However, due primarily to the US Offering, the Company has determined to impose the transfer restrictions of Regulation S for a period of two years from the Closing Date. Such additional restriction is imposed by way of contractual undertaking contained in the Application Form. Attention is drawn to this undertaking and prospective applicants are advised to read and ensure that they understand the terms of this undertaking as set out in the Application Form. Persons subscribing for New Common Shares and subsequent purchasers of the New Common Shares will be deemed to have agreed to the transfer restrictions set out in Part VI of this document and to have agreed not to effect transfers of the New Common Shares except to transferees who also agree to the restrictions, where the restrictions are still applicable.

*See Sky Capital Enterprises Inc. May 2005 Offer for Subscription.*

Following the dictates of *Morrison* and its progeny, the locus of such transactions was indisputably the U.K., not the U.S. Accordingly, the jury heard *extensive* evidence regarding transactions and alleged frauds that were clearly foreign in nature -- not domestic -- including the manipulation of an English stock exchange, and misrepresentations made by brokers who were physically located in London, to English investors, regarding securities which could only be sold

in the U.K., and which traded exclusively on an English exchange.

### 3.    Effect of *Morrison* on Counts 1 and 2

We believe that the evidence introduced at trial – especially the evidence relating to events occurring within the relevant statute of limitations, predominantly related to foreign transactions.   However, even if some portion of the transactions introduced at trial *were* domestic, the Defendant's conviction should still be set aside, because it is impossible to conclude, beyond a reasonable doubt, that the jury relied upon those domestic transactions to reach its verdict.

Indeed, at the end of the day, neither the Defendant, the Government, nor the Court can say with any certainty *which* transactions the jury relied upon in convicting the Defendants. Although defense counsel repeatedly sought a bill of particulars outlining the specific transactions the Government was relying upon to prove securities fraud, those requests were denied.  Likewise, when the Defendants moved to exclude evidence of foreign transactions, the Government opposed the motion, and the Court denied it.   Defense counsel requested an instruction "in connection with each count" that would have required the jury to find that the alleged fraudulent conduct was in connection with "a domestic securities transaction". Defendant's Request to Charge at p. 99.   The Court refused to provide the requested charge. Finally, the Jury was not provided with a special verdict sheet which would have permitted the Court to discern which transactions were the bases for its verdict.

We respectfully submit that Court's refusal to preclude evidence relating to foreign securities transactions, combined with its refusal to instruct the Jury that a violation of Rule 10(b) must be premised upon a domestic securities transaction, requires the reversal of the

Defendant's conviction on Counts 1 and 2.

Harmless error analysis applies to instances in which a conviction on a particular count is based on a general verdict and the trial court provided the jury with a partially invalid instruction. *See Skilling v. United States*, 130 S. Ct. 2896, 2934 & n.46 (2010); *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008). The reviewing Court should "conduct a thorough examination of the record" and affirm the conviction if it can "conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error." *Neder v. United States*, 527 U.S. 1, 18 (1999).

In the instant case, it is impossible to conclude, *beyond a reasonable doubt*, that the Jury based its verdict with respect Counts 1 and 2 upon a finding of domestic, as opposed to foreign, fraud. This is certainly not a frivolous issue, and at the very least raises a substantial question of law.

### 4.     Effect of *Morrison* on Counts 3 and 4

As set forth above, there is a significant chance that the jury improperly relied upon one or more extraterritorial transactions in order to convict the Defendants under Counts 1 and 2. If that indeed, happened, it necessarily follows that the Jury would have automatically convicted the Defendants under Counts 3 and 4, insofar as those Counts, as charged, merely required the Jury to find a mailing or phone call in addition to the securities fraud. As the Government told the jury in summation:

> Count Three is wire fraud. It's the same scheme to defraud, but you've got to find
> that it went through the wires . . . And the fourth count is mail fraud. Again, it's
> the same scheme to defraud that I have just outlined for you, but same this time
> you've got to find that the conspirators used – rather, the defendants used the
> mails.

TR 3513.

In this manner, the improper charge with respect to Counts 1 and 2 resulted in significant spillover prejudice which would have necessarily effected the jury deliberation on Counts 3 and 4.

Moreover, we note that the Mail and Wire Fraud statutes are subject to the same presumption against extraterritoriality which the Supreme Court applied in interpreting 15 U.S.C. § 78j(b). Contrary to the Government's arguments, the instant case is distinguishable from *Pasquantino v. United States*, 544 U.S. 349, 125 S.Ct 1766 (2005), insofar as that case merely held that the wire fraud statute could be used to prosecute a *domestic fraud* which impacted a foreign sovereign. The Court found that there was no extraterritorial application of the mail fraud statute, because the "offense was complete the moment they executed the scheme in the United States."

By way of contrast, as set forth above, significant portions of the alleged scheme in this case took place *exclusively* in the United Kingdom, including misrepresentations which were made abroad to U.K. citizens, and the alleged manipulation of the AIM exchange in London. Hence, this case, unlike *Pasquantino*, *did* involve an extraterritorial application of fraud statutes.

Finally, even if the Court determines that the Defendants' convictions under Counts 3 and 4 are not vulnerable under a *Morrison* analysis, the Court should nevertheless recognize that a reversal with respect to Counts 1 and 2 would significantly alter the Defendants' legal culpability. In particular, Counts 3 and 4 pertained only to private placement offerings in Sky Capital Holdings, Sky Capital Enterprises and Global Secure which were made after June 30, 2004. By way of contrast, the fraudulent conduct covered by Count 1 was far more expansive,

reaching back to at least 1998, and covering multiple offerings not considered by the jury in connection with Counts 3 and 4.  Accordingly, if the Second Circuit reverses the Defendants' convictions on Counts 1 and 2, the Defendants may be entitled to significantly reduced sentences.

**B.**     **There is a Substantial Question of Law As
To Whether the Court Erroneously Charged
the Jury With Respect to Counts 3 and 4____**

We respectfully submit that the Court erred when it instructed the jury that it need not find that the Defendants *actually made* a material misrepresentation in order to convict on Counts 3 and 4.  In particular, the jury was charged as follows, over defense counsel's objection:

> In order to establish a scheme to defraud, the government need not show that the defendant you are considering made a misrepresentation.  A scheme to defraud can exist even if the scheme did not progress to the point where misrepresentations would be made.

TR 3680; *see also* TR 3867 (same instruction for mail fraud); defense objection at

TR 3424.

While we acknowledge that the Government was not required to prove that the fraud was successful, in terms of causing an actual loss, we believe that the Court went *too* far in instructing the jury that it need not find that a misrepresentation was even made.

To the contrary, a "material misrepresentation" (or a material omission combined with a duty to disclose) is an essential element required to prove mail or wire fraud.  *See United States v. Rybicki*, 354 F.3d 124, fn 20 (2d Cir. 2003) ("The phrase 'scheme or artifice to defraud' requires material misrepresentations."); *United States v. Foxworth*, 334 Fed. Appx. 363, 366, 2009 U.S. App. LEXIS 12192, *5 (2d Cir. 2009)("A material misrepresentation or omission is an

element of honest services wire fraud . . ."); *United States v. Salvagno*, 306 F. Supp. 2d 258, 265 (N.D.N.Y 2004) (scheme or artifice to defraud requires proof of "(1) the existence of a scheme to defraud; (2) specific intent to defraud on the part of the defendant; and, (3) material misrepresentations.").

Indeed, we believe that permitting a fraud conviction in the absence of a material misrepresentation would render 18 U.S.C. §§ 1341 and 1343 unconstitutionally vague.  By way of illustration, consider the following scenario:

> Andy calls or writes a letter to Bill, informing Bill that he (Andy) has devised a brilliant scheme to defraud, explaining the fraud in detail, and seeking Bill's assistance in effectuating the fraud.  Bill does not respond, and the next day Andy forgets about the whole thing.

The question is whether the conduct described above would constitute a federal crime punishable by up to 20 years incarceration.  Note that in the absence of an agreement, or steps taken beyond preparation, there is neither a conspiracy nor an attempt.  And yet, insofar as Andy "devised" a scheme with fraudulent intent, and used the U.S. mail or wire to further that scheme, the conduct would appear to satisfy elements of substantive wire or mail fraud as set forth by the Court.  We respectfully submit that this cannot be correct.

Because a jury instruction that omits an essential element of the offense is a constitutional error, a conviction can only stand if such error was harmless beyond a reasonable doubt. *United States v. Tureseo*, 566 F.3d 77, 86 (2d Cir. 2009), *citing DiGuglielmo v. Smith*, 366 F.3d 130, 136 (2d Cir. 2004) and *Neder v. United States*, 527 U.S. 1, 8-10, 119 S. Ct. 1827, 144 L. Ed. 2d 35 (1999).

In the instant case, we respectfully submit that the Court's failure to require the jury to

14

find a material misrepresentation – the very essence of any fraud – cannot be deemed harmless error.   At the very least, the issue raises a substantial question of law which entitles the Defendant to bail pending appeal.

**C.     The Government's Material Omission Theory Of**
**        Liability Was Not Supported by the Fact or the Law**

The alleged fraud in this case was premised in substantial part upon the notion that the brokers were under an affirmative obligation to disclose various types of information to their clients – including the financial incentives they were receiving to sell the securities in question – and that they failed to do so.  Hence, in summation, the Government told the jury:

> Now, I expect defense counsel to argue to you that the brokers had no duty to disclose these payments to their clients because, one, they were bonuses and, two, because brokers don't have to tell their clients how much they make on a trade.
>
> But these brokers were being offered 400 percent more than their regular commissions to buy Sky stock.  You know when the money is this big an investor would want to know, especially if the money is the only reason the brokers are pushing Sky stock on their investors.
>
> TR 3507.

This theory of liability substantially misstated U.S. law as it existed at the time, in that U.S. brokers *did not* have any affirmative duty to disclose unless they have entered into a fiduciary relationship with the customer.[3]  As the Second Circuit has noted:

> Tracing back to the common law principle of *caveat emptor,* it is a fundamental tenet of Anglo-American commercial law that neither a seller nor a middleman has an obligation to disclose his financial incentives for selling a particular commodity. While the federal securities laws provide the Securities and Exchange Commission with the power to override this principle by promulgating rules that require specific disclosures, and while, pursuant to such rules, a broker/dealer . . .

---

[3]     Another significant question is the extent to which a duty to disclose exists under *U.K. law*.  The record is utterly devoid of any evidence on this point, a problem which highlights the *Morrison* issue discussed *supra*.

15

must disclose to its customers the remuneration it receives for executing their trades, *see* Rule 10b-10, 17 C.F.R. § 240.10b-10, no SEC rule requires the registered representatives who deal with the customers to disclose their own compensation, whether pegged to a particular trade or otherwise. *See United States v. Alvarado,* No. 01 Cr. 156, 2001 WL 1631396, at *4, 2001 U.S. Dist. LEXIS 21100, at *27-28 (S.D.N.Y. Dec. 19, 2001).

Here, moreover, the indictment only charged violations of the general anti-fraud provisions of the securities laws and rules (such as Rule 10b-5) and the comparable provisions of the wire fraud statute. *See* 18 U.S.C. §§ 1343, 1346. Under those provisions, a seller or middleman may be liable for fraud if he lies to the purchaser or tells him misleading half-truths, but not if he simply fails to disclose information that he is under no obligation to reveal. Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading "half-truths" simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment.

*United States v. Skelly*, 442 F.3d 94, 97 (2d Cir. 2006).

While a duty to disclose compensation *may* arise in the rare circumstance where a broker enters into a fiduciary relationship with a customer, that type of relationship usually exists only where the broker is vested with discretionary authority over the account. As the Second Circuit has cautioned:

> . . . a fiduciary obligation is not to be lightly implied, lest it undercut the basic principles of commercial law described above. To label someone a fiduciary is to impose on that person obligations additional, and often contrary, to the ordinary allocations of responsibility that govern commercial transactions. Before the rigors of the criminal law may be imposed, the broker in question should reasonably be on notice that he has entered into a relationship with his customer that gives him heightened responsibilities.

*Id.*

In the instant case, the Government failed to introduce evidence sufficient to demonstrate discretionary authority or the existence of a fiduciary relationship. To make matters worse,

prosecutors elicited misleading testimony from one of the broker-witnesses, who incorrectly informed the jury that a duty to disclose nevertheless existed.  In particular, the Government elicited the following testimony from Michael Passaro:

> Q:      What was your understanding of why this payment was called a bonus?
>
> A.  Well, it was called a bonus for one simple reason that it is illegal or against the rules --
>
> MR. BACHNER:  Objection.
>
> THE COURT:  Overruled.
>
> A.  -- to take an additional commission without disclosing to the investor what you're getting.  So it was deemed to be a bonus, which is pretty innocuous compared to an inside commission on the stock that we're selling.
>
> TR 1269; *see also* TR 1277.

This quasi-expert testimony elicited a mistrial motion from both Defendants, which the Court denied.  TR 1308.  Given the Second Circuit's holding in *Skelly* we respectfully submit there is substantial question as to whether the admission of this highly prejudicial testimony was in error, and whether a mistrial should have been granted.  Moreover, given the complete dearth of evidence regarding the existence of a fiduciary relationship between the brokers and customers, there is also a substantial question as to whether the evidence was sufficient to support the Defendants convictions under a "material omission" theory.

**D.**     **Defendant's Speedy Trial Argument Raises a Substantial Question of Law**

Immediately prior to trial, counsel moved for a dismissal of the indictment on speedy trial grounds.  Counsel focused in particular upon the delay occasioned by Your Honor's vacation and the Court's resultant unavailability to preside over the previously scheduled March, 2011 trial

date.  At the time, the Court candidly conceded that this unavailability had contributed to a delay

in the proceedings:

> THE COURT: I plead guilty.

> MR. HOFFMAN: No, no, no, no. I don't mean it that way at all.

> THE COURT: I plead guilty. I'm the architect here of an awful lot of difficulties, for counsel and in particular for Judge Bianco, for which I'm very sorry, but I wouldn't have done it -- I'm not trying to be arbitrary about it, Mr. Hoffman. Judges have lives too, and I'm trying to accommodate some of the things –

> MR. HOFFMAN: I understand that. I don't mean it in that respect at all.

> March 21, 2011 transcript at p. 6.

In denying Defendant's motion, the Court relied (in part) upon evidentiary notices that

the Government served on March 16th and 17th of 2011, but which do not appear on the Court's

docket.  The Court deemed these notices to constitute "motions in limine . . . [that] stopped the

pretrial clock until they were resolved on June 15, 2011."  The Court went on to hold that

"[t]here is no basis for Mandell's argument that in limine motions do not count against the

speedy trial count." June 21, 2011 Order at p. 4.

In fact, at least one Circuit Court has repeatedly held that evidentiary notices filed by the

Government – such as evidentiary notices under FRE Rule 609 and 404(b) – <u>do not</u> constitute

motions for speedy trial purposes. *See United States v. Harris*, 491 F.3d 440, 443-444 (D.C. Cir.

2007) (Government's notice of intent to impeach pursuant to FRE 609 was not motion excluding

speedy trial time); *writ of certiorari denied*, 552 U.S. 1157, 128 S. Ct. 1106, 169 L. Ed. 2d 837

(2008); *United States  v. Bryant*, 523 F.3d 349, 358 (D.C. Cir. 2008) (same); *United States v.*

*Van Smith*, 530 F.3d 967 (2008) (same); *United States v. Marshall*, 669 F.3d 288, 293-294 (D.C.

Cir. 2011) (Government Rule 404(b) filing is a notice, not a motion for speedy trial purposes); *see also United States v. Bloate*, 655 F.3d 750,757 (8th Cir. 2011) ("This court rejects a definition of motion so broad that any filing can be deemed a motion.").

Because the Second Circuit does not appear to have ruled on this question, the issue raises a substantial question of law. If the Defendant is correct, then it would appear that a significant period of non-excludable delay followed the Court's March 16, 2011 decision on the motions.

Indeed, even if defense counsel's April 19th, 2011 *ex-parte* motion to withdraw as counsel did thereafter toll the clock, we note that 30 non-excludable days passed before this motion was filed. In addition, at least 19 days passed between the Court's denial of the motion to withdrawal and June 1, 2011, the date on which defense counsel filed its motions in limine.

In addition to this delay of (at least) 49 days occurring between March 16, 2011 and June 1, 2011, we believe that other periods of non-excludable delay occurred over the two years this case was pending, which if totaled, exceed the 70 days allotted by statute.

It is well established that a defendant may not expressly waive his rights under the Speedy Trial Act. *See, e.g., United States v. Saltzman*, 984 F.2d 1087, 1090-1092 (10th Cir. 1993). Rather, the trial judge must explicitly determine that the "ends of justice" served by a continuance outweigh the interest of the public and the defendant in a speedy trial in order for the delay to be excluded from the Act's time limits. 18 U.S.C. § 3161(h)(7)(A). The Court must set forth, orally or in writing, his reasons for granting the continuance. 18 U.S.C. § 3161(h)(7)(A). Mandatory consideration of the factors delineated in 18 U.S.C. § 3161(h)(7)(B) was intended to ensure that District Courts do not invoke the continuance

provision for the wrong reasons. *United States v. Carrasquillo*, 667 F.2d 382, 387 (3d Cir. 1981). Hence, without on-the-record findings, there can be no exclusion. *See Bloate v. United States*, 130 S.Ct. 1345, 1357-1358 (2010).

Although the Court was required, on the Defendants' motion to dismiss, to identify all periods of excludable and non-excludable delay, the Court's June 21, 2011 did not do that, but rather focused specifically on the two periods delay cited in the Defendant's brief. *Zedner v. United States*, 547 U.S. 489, 507 (2006). We believe that this narrow focus may have caused the Court to overlook other periods of non-excludable delay.

For instance on April 30, 2010, after issuing a decision with respect to the Defendant's motion to suppress, the Court issued a rote, *sua sponte* order excluding time as "necessary to continue defendants preparation for trial." There may well be an issue whether Defendants were consulted prior to this determination, and the Court did not otherwise address the factors set forth in the statute. Hence, the time from April 30th through May 12, 2010 (when defense counsel filed its motion for reconsideration) should count towards the Speedy Trial violation. Likewise, a substantial question of law exists as to whether the Court's September 14th, 2010 Memo endorsement of the Government's request to adjourn the case (with defendants' consent) satisfied the requirements of the statute. Without even having an opportunity to review all of the pretrial transcripts, counsel notes that these periods of delay cumulatively exceed the 70 day limit.

Because a violation of the Speedy Trial Act mandates dismissal of the indictment, the issue is a substantial one, and an appropriate ground for granting the Defendant bail pending appeal.

## CONCLUSION

For the all of the foregoing reasons, the Defendant Ross Mandell respectfully requests that his motion for bail pending appeal be granted, and that his bail be continued based upon the conditions which are currently in place.   Hoffman & Pollok, LLP further requests to be relieved as counsel and for the appointment and substitution of Matthew Brissenden, Esq. under the Criminal Justice Act.

Dated: Garden City, New York
       May 22, 2012

Respectfully submitted,

HOFFMAN & POLLOK LLP
BY: *Susan C. Wolfe*
    SUSAN C. WOLFE
260 MADISON AVENUE
NEW YORK, NEW YORK 10016
T. (212) 679-2900
F. (212) 679-1844
SCWOLFE@HPPLEGAL.COM

MATTHEW W. BRISSENDEN, P.C.
Counsel for Ross Mandell
666 Old Country Road, Suite 501
Garden City, NY 11530-2004
(516) 683-8500
*Of Counsel For Purposes Of This Motion*

21